## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| PLASSEIN INTERNATIONAL | ) | Case No. 03-11489 (KG) |
| CORPORATION, *et. al.*, | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| WILLIAM BRANDT, as the | ) | |
| Trustee of the Estates of | ) | |
| Plassein International Corp., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 05-51472(KG) |
| | ) | |
| TRIVEST II, INC.; TRIVEST | ) | |
| PARTNERS, L.P.; and GULFSTAR | ) | |
| GROUP, INC. | ) | |
| | ) | |
| Defendants. | ) | **Related Docket Nos: 72, 74 & 82** |
| _____ | ) | |

## <u>MEMORANDUM OPINION[1]</u>

## BY: KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE

Debtor Plassein International Corporation ("Plassein") and its related entities
(collectively "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United
States Code (hereinafter the "Bankruptcy Code") on May 14, 2003.  On October 24, 2003,

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law required
by Federal Rule of Bankruptcy Procedure 7052.

this Court entered an Order Converting Chapter 11 Cases to Chapter 7 [D.I. 729][2].  On February 6, 2004, this Court entered an Order appointing William Brandt as trustee of the Debtors' estates [D.I. 915].

Prior to its bankruptcy filing, Plassein acquired several privately held corporations by purchasing the shares of the companies' respective shareholders.  The Chapter 7 trustee, William Brandt (the "Trustee") filed this adversary proceeding on May 11, 2005 against Defendant Trivest II, Inc. ("Trivest II"), Trivest Partners, L.P. ("Trivest Partners" and together with Trivest II, "Trivest"), and Defendant GulfStar Group, Inc. ("GulfStar") (collectively, the "Defendants") to recover certain fees paid to the Defendants in connection with the acquisition, alleging that the payments to the Defendants were fraudulent conveyances pursuant to 11 U.S.C. § 544 and applicable Delaware law.

Before the Court are: (1) GulfStar's Motion for Summary Judgment [A.D.I. 72] and (2) Trivest's Motion for Summary Judgment [A.D.I. 74] (collectively, the "Motions").  After careful analysis of the facts and legal standards, the Court will **DENY** the Motions, for the reasons set forth below.

## JURISDICTION

The Court's jurisdiction rests upon 28 U.S.C. §§ 157 and 1334.  The adversary proceeding is a core matter under 28 U.S.C. § 157(b)(2); and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] Docket numbers from the main case will be referred to as "D.I. __."  Docket numbers from the adversary proceeding will be referred to as "A.D.I. __."

## STATEMENT OF FACTS

In 1999, Plassein Film & Packaging Corp. ("Packaging") was formed under the laws of the State of Texas for the purpose of acquiring several privately held manufacturers of flexible packaging and specialty film (the "Target Companies"). (Khale Decl. ¶ 3.) On June 18, 1999, Plassein[3] was formed under the laws of the State of Delaware for the purpose of making the acquisitions of the Target Companies. (Compl. ¶ 7; Kahle Decl. ¶ 4.) Plassein made the acquisitions through a series of leveraged buyouts ("LBO") whereby a group of lenders advanced funds and extended credit to Plassein in exchange for security interests in the Target Companies' assets and promises by the Target Companies to repay the loans. (Compl. ¶ 7.) Plassein then used those funds to acquire the stock of the Target Companies and to pay off the Target Companies' existing secured debt. (Compl. ¶¶ 15-16.)

The LBO transactions proceeded in two phases. In the first phase, on January 10, 2000 (the "January Acquisition"), Plassein closed on acquisitions of the stock of: (a) Plastical Industries, Inc. ("Plastical," n/k/a Plassein International of Spartanburg, Inc.); (b) Nor Baker Industries, Ltd. ("Nor Baker," now in liquidation in Canada); (c) Marshall Plastics Film, Inc. ("Marshall," n/k/a Plassein International of Martin, Inc.); and (d) Key Packaging Industries Corp. ("Key," n/k/a Plassein International of Salem, Inc.). (Compl. ¶ 8-13.) Plassein also purchased the assets of Transamerican Plastic LLC ("Transamerican," n/k/a Plassein International of Ontario, Inc.). (*Id.*) In the second phase, on August 15, 2000 (the "Rex

---

[3] Plassein was incorporated under the name "Plassein Packaging Corp." and subsequently renamed "Plassein International Corp." (Trustee's Stm't Undisp. Facts ¶ 1.)

3

Acquisition") (collectively with the January Acquisition, the "Acquisitions"), Plassein acquired the stock of Rex International, Inc. ("Rex," n/k/a Plassein International of Thomasville, Inc.). (Compl. ¶ 20-23.)

A. **The January Acquisition**

On May 18, 1999, Packaging entered into an agreement with GulfStar (the "Engagement Letter")[4] under which GulfStar agreed to perform certain functions in connection with the January Acquisition.[5] (Kahle Decl. ¶ 3.) Pursuant to the Engagement Letter, GulfStar agreed to arrange or provide start-up funding for Plassein until the initial acquisitions were made. (Engm't Letter 1). In addition, GulfStar agreed to perform acquisition and private placement services on Plassein's behalf, as well as financial advisory services in connection with an Initial Public Offering of Plassein's stock. (*Id.* at 1-2.) The Engagement Letter sets forth GulfStar's compensation as follows: (a) a merger and acquisition advisory fee of one percent (1.0%) of the acquisition value for each acquisition; (b) a private placement fee equal to five percent (5.0%) of the amount of equity-related securities placed plus three percent (3.0%) of the amount of subordinated debt securities

---

[4]A copy of the Engagement Letter is attached as Exhibit 1 to the Declaration of G. Kent Kahle.

[5] The Trustee contends that Plassein was not a party to the Engagement Letter because the original agreement between GulfStar and Packaging was never amended to include Plassein. (See Trustee's Stm't Undisp. Facts ¶ 2.) GulfStar, however, has submitted testimony to this Court indicating that Plassein assumed all of the rights and obligations of Packaging, including its rights under the Engagement Letter. (Khale Decl. ¶ 4.) Therefore, the Court is satisfied that Plassein assumed Packaging's rights and obligations under the Engagement Letter.

4

placed plus one percent (1.0%) of the principal amount of senior debt arranged, irrespective of the amount funded at closing; and (c) reimbursement for direct out-of-pocket expenses reasonably incurred in connection with the assignment. (*Id.* at 3.)

Subsequently, GulfStar and Plassein determined that they needed the assistance of Trivest to locate and obtain financing in order to complete the January Acquisition. (Vandenberg Decl. ¶ 5; Kaczynski Decl. ¶ 3.) On October 13, 1999, Trivest and Plassein signed a letter of intent (the "Letter of Intent")[6] under which Trivest agreed to perform certain functions in connection with the Acquisitions. (Vandenberg Decl. ¶ 6; Kaczynski Decl. ¶ 4.) Pursuant to the Letter of Intent, Trivest agreed to cause affiliated entities to invest at least $15,000,000 in Plassein. (Letter of Intent 1). Trivest also agreed to work with the financing sources to develop an appropriate capital structure that would accomplish the January Acquisition and facilitate Plassein's growth. (*Id.* at 2). Finally, Trivest agreed to provide management capital placement services and support with respect to financial planning, lender negotiations, business strategy, recruiting, acquisitions and to assist management in developing and implementing a strategic plan to realize Plassein's objectives. (*Id.*) The Letter of Intent sets forth Trivest's compensation as follows: (a) a transaction fee of $1,000,000 at closing; and (b) a future acquisition transaction fee based on a specific formula of (i) 3% on the first $10 million of transaction value, (ii) 1.5% on the next $40

---

[6] A copy of the Letter of Intent is attached as Exhibit 1 to the Declaration of Davis Lee Wright.

million of transaction value, and (iii) 0.75% on transaction value in excess of $50 million. (Letter of Intent Investment Term Sheet).

In connection with the January Acquisition, GulfStar served as Plassein's financial advisor throughout the process of drafting and negotiating the necessary purchase agreements. (Kahle Decl. ¶ 5.) In addition, GulfStar provided start-up funding for Plassein to cover Plassein's expenses until it made the January Acquisition, assisted with the private placement of equity and debt financing to be used for the January Acquisitions, and provided additional funding for capital expenditures and for additional acquisitions. (*Id.*) GulfStar also assisted in the selection and hiring of an outside accounting firm to conduct due diligence, and prepared a confidential memorandum sent to various potential lenders and private equity firms. (*Id.* at ¶¶ 5-6.)

In connection with the January Acquisition, Trivest conducted due diligence, which included analysis of financial projections and forecasts, management structuring and contracts. (Vandenberg Decl. ¶¶ 7-8; Kaczynski Decl. ¶ 8.) In addition, Trivest obtained the financing for the January Acquisition as well as the necessary capital to allow Plassein to operate after the acquisition. (Vandenberg Decl. ¶ 8.) Specifically, Plassein entered into a $53 million loan and security agreement with a syndicate of banks led by Fleet Capital Corporation (collectively, "Fleet"). (Kaczynski Decl. ¶ 9.) The loan consisted of (a) a $20 million revolving credit facility; (b) $28 million in term loans; and (c) a $5 million capital expenditure facility. (*Id.*) Trivest also obtained $26.8 million in equity investments for

Plassein, which consisted of $19.6 million of equity from affiliated funds of Trivest and $800,000 from GulfStar.  (*Id.*)

On January 10, 2000, Plassein closed on the January Acquisition.  (Kahle Decl. ¶ 8; Vandenberg Decl. ¶ 9; Kaczynski Decl. ¶10.)  At the time of closing, Plassein paid (1) an investment fee of $1 million to GulfStar pursuant to the terms of the  Engagement Letter; and (2) an investment fee of $1 million to Trivest pursuant to the terms of the Letter of Intent (collectively, the "January Investment Fees").  (Kahle Decl. ¶ 9; Vandenberg Decl. ¶ 9; Kaczynski Decl. ¶10.)  Simultaneously with the closing, Plassein and Trivest entered into a management services agreement (the "Management Agreement")[7] which incorporated and restated the terms of the Letter of Intent.  Under the Management Agreement, Trivest agreed to provide certain management services, for which it would receive an annual fee of $300,000.  (Mgmt. Agreement §§ 6.1 and 6.4.)

**B.  The Rex Acquisition**

Subsequent to the January Acquisition, Plassein decided to acquire Rex. (Vandenberg Decl. ¶ 11; Kaczynski Decl. ¶ 15.)  After reviewing the proposed acquisition, Fleet amended and restated the original loan and security agreement and loaned more funds to Plassein to purchase Rex.  Specifically, Fleet agreed to increase the credit facility from $53 million to $72.5 million.  (Kaczynski Decl. ¶ 17.)

---

[7] A copy of the Management Agreement is attached as Exhibit 2 to the Declaration of Davis Lee Wright.

7

In connection with the Rex Acquisition, Trivest made an additional equity investment of $6.2 million.  (Vandenberg Decl. ¶ 12; Kaczynski Decl. ¶ 17.)   In addition, Trivest negotiated with the lenders, arranged the financing and assisted Plassein with negotiating the purchase price of Rex.  (Vandenberg Decl. ¶ 12; Kaczynski Decl. ¶¶ 16-17.)   Trivest also conducted due diligence and provided necessary underwriting services.  (Vandenberg Decl. ¶ 12; Kaczynski Decl. ¶ 16.)

On August 15, 2000, Plassein closed on the Rex Acquisition.  At the time of closing, Plassein paid a transaction fee of $972,000 to Trivest Partners pursuant to the terms of the Letter of Intent and Management Agreement (the "Rex Transaction Fee").  (Vandenberg Decl. ¶ 13; Kaczynski Decl. ¶¶ 18.)  Simultaneously with the closing, Plassein and Trivest entered into a supplement to the Management Agreement (the "Supplemental Agreement").[8]  Under the Supplemental Agreement, Plassein agreed to increase Trivest's annual management compensation from $300,000 to $400,000.  (Supplemental Agreement 1.)

C.  **Trivest's Management Services**

Trivest began to perform management services for Plassein immediately after the closing of the January Acquisition.  (Kaczynski Decl. ¶ 11.)  These services included, among other things, investor relations, negotiations with lenders, operational review and oversight of Plassein and its subsidiaries, meetings with key management, and plant visits.  (*Id.* at ¶

---

[8] A copy of the Supplemental Agreement is attached as Exhibit 4 to the Declaration of Davis Lee Wright.

12.)  Plassein, in turn, paid Trivest management fees totaling $993,017 for the years 2000 through 2002 (the "Management Fees").[9]  (See Wright Decl., Exh. 5 at 12.)

## THE PARTIES' POSITIONS

### A.    Defendants' Arguments

GulfStar and Trivest each argue that summary judgment is appropriate because the Trustee has failed to establish two of the essential elements of the fraudulent transfer claim: (1) that Plassein did not receive reasonably equivalent value in exchange for the fees paid to the Defendants and (2) that Plassein was involved in transactions that left it with unreasonably small capital with which to operate its businesses.

### B.    Trustee's Arguments

The Trustee argues that the record developed in this case raises considerable questions on the issue of value of Defendants' services to Plassein.  Specifically, the Trustee questions (i) whether Defendants provided any value to Plassein with their pre-transaction and duplicative investment and management services; and (ii) whether Defendants provided equivalent value, especially given that both Defendants stood to profit from the transactions. The Trustee further argues that the January Acquisition and the Rex Acquisition left Plassein with insufficient capital with which to support its business operations.

---

[9] According to the Trustee's Complaint, the Management Fees totaled $1,269,685.  (Compl. ¶ 31.)  Trivest contends, however, that the Trustee has failed to produce any evidence supporting the alleged amounts.  (See Trivest's Brief Supp. Mot. Summ. J. at p. 15, n.5.)

## DISCUSSION

### A.    Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it might alter the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must view the facts and draw inferences in the light most favorable to the non-moving party.  *Id.* at 255.  If the non-moving party's evidence contradicts the movant's evidence, the non-movant's evidence must be taken as true.  *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994).

In a motion for summary judgment, the moving party "always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has properly informed the court of its basis for the motion, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "may not rest upon the mere allegations or denials of his

pleading." *Id.* Moreover, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*

At the summary judgment stage, the court's role is not to weigh the evidence or determine its credibility, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must find sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

**B.      Legal Standard for Fraudulent Transfer**

The Trustee's claims against Defendants are based upon sections 1304 and 1305 of the Delaware Code, which are applicable to this proceeding pursuant to section 544 of the Bankruptcy Code.

Section 1304 of the Delaware Code provides, in relevant part,

>     (a)      A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

>                                    ***

>     (2)      Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a.      Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b.      Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del. C. § 1304.  Section 1305 of the Delaware Code provides, in relevant part,

(a)      A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

6 Del. C. § 1305.  Thus, in order to state a claim under Delaware Code sections 1304 and 1305, the Trustee must allege that (i) the debtor made a transfer[10] (ii) for less than reasonably equivalent value and (iii) the debtor was, or was rendered, insolvent thereby.  To succeed on its motion for  summary judgment, the Defendants need only demonstrate that the Trustee has failed to prove one of these elements.

(1)      Reasonably Equivalent Value

In order to succeed on his fraudulent transfer claim, the Trustee must first prove that Plassein made the transfer for less than reasonably equivalent value.  *See* 6 Del. C. §

---

[10] No party disputes that the fees at issue are transfers.  Therefore, the Court will not address the first prong of the fraudulent transfer test.

12

1304(a)(2) and 1305(a). Determining whether a transfer was made for reasonably equivalent value is a two-step inquiry. First, the court must determine if the debtor received any value. If the court concludes that the debtor received value for the transfer, the court must then determine whether value received is reasonably equivalent to the value transferred. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996).

The applicable statutes do not define "reasonably equivalent." Rather, courts have defined the scope and meaning of the term. *Id.* at 148. In doing so, courts consider the totality of the circumstances. *Id.* at 153. Courts have generally considered three factors: (1) whether the transaction was at arm's-length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid. *Id.* at 145. Proper application of the totality of the circumstances test requires a comparison between the value that was conferred upon the debtor and the fees paid to the transferee. *Id.* at 154. *See also Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212-13 (3d Cir. 2006) ("If a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave.").

The transfers at issue here are January Investment Fees, the Rex Transaction Fee and the Management Fees (collectively, the "Fees"). Plassein paid the Fees in exchange for

13

GulfStar and Trivest's services under various contracts entered into between the parties which services enabled Plassein to consummate the Acquisitions.  The Trustee does not contend that either GulfStar or Trivest failed to perform the services as agreed.  Thus, there is little question that Plassein received something of value from GulfStar and Trivest in exchange for the Fees.  The question that remains is whether the benefit received by Plassein is reasonably equivalent to the nearly $3 million in fees that it paid.

GulfStar argues that it performed all required services under the Engagement Letter and, therefore, provided reasonably equivalent value in exchange for the fees it received from Plassein.  Likewise, Trivest argues that it provided important services to Plassein in connection with the Acquisitions in exchange for reasonable and customary fees.  Defendants further argue that the Trustee's Complaint relies on a flawed theory – the services provided by GulfStar and Trivest could not have been for reasonably equivalent value because the Acquisitions ultimately harmed Plassein.  Citing cases from outside of our Circuit, Defendants note that the fraudulent transfer analysis does not permit such a broad approach to equivalent value.  Rather, the inquiry is limited to the specific consideration exchanged in the specific transaction the debtor seeks to avoid.  *See Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 680 (Bankr. S.D.N.Y. 2000); *Solow v. Reinhardt (In re First Commer. Mgmt. Group, Inc.)*, 279 B.R. 230, 238 (Bankr. N.D. Ill. 2002); *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 490-91 (D. Conn. 2002).  Finally, Defendants argue that the Trustee cannot provide any evidence that

14

raises an issue of fact as to the value of their services.  The Court does not agree.  The Court finds that the Trustee has raised numerous issues of fact that warrant the denial of the Motions.

The Trustee argues that the Defendants' services were duplicative, and therefore not reasonably equivalent to the Fees Plassein paid.  At least one Delaware court has looked to the fact that a second set of hired professionals performing duplicate work of the first is strong evidence of insufficient value from the services of the first group. *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt., Inc.)*, 320 B.R. 265, 280 (Bankr. D. Del. 2005).

In his declaration, Mr. Vandenberg described the services Trivest provided in exchange for the fees it received from Plassein as "obtaining financing for the acquisitions, securing equity investments and providing additional management and support services." (Vandenberg Decl. ¶ 6.)  In addition, Mr. Vandenberg stated that Trivest provided due diligence prior to the acquisition, (*Id.* at ¶ 7), and obtained "the required financing to complete Plassein's acquisition of the [Target] Companies and provid[ed] sufficient post-acquisition working capital" (*Id.* at ¶ 8.)

Mr. Kahle, for GulfStar, provided the following description in his declaration:

In fulfilling its obligations under the Engagement Letter, GulfStar acted as Plassein's agent in (i) arranging and providing start-up funding for Plassein to cover Plassein's expenses until the initial acquisitions; (ii) providing financial advisory services in the acquisition of [the Individual Debtors], (iii) the private placement of equity and debt financing to be used to fund the acquisition of the

[Individual Debtors], and (iv) providing additional funding for capital expenditures and for additional acquisitions.

(Kahle Decl. ¶ 5.)

The Trustee notes that the list of services provided by Mr. Kahle essentially mirrors the list provided by Mr. Vandenberg, thus leaving a strong factual question that GulfStar and Trivest individually provided services sufficient to warrant payment of such large fees.

The Trustee also argues that the Defendants' fees were not negotiated at arm's length. The Trustee supports this argument with the following facts:

- Trivest after each transaction gained a controlling number of board members and shares in Plassein, a condition of its involvement. (See Wright Decl., Exh. 1; Letter of Intent Investment Term Sheet.)

- At the closing of the January Acquisition, Kent Kahle of GulfStar executed numerous documents, both as an officer and director of Plassein and as the principal of GulfStar. He also signed the so-called Letter of Intent, engaging Trivest, as both Chairman of Plassein and President of GulfStar. (See Kahle Dep., Exhs. 38 and 39; Bennett Decl., Exh. 3.)

- Trivest and GulfStar had a side letter requiring Trivest to give GulfStar the lion's share of any future investment fee after the January Acquisition, namely, 85%. (*Id.*)

- When Trivest entered its first management agreement with Plassein on the date of the January Acquisition, Kahle signed on behalf of Plassein and Kaczynski on behalf of Trivest. (See Wright Decl., Exh. 2; Kahle Dep., Exhs. 38 and 39; Bennett Decl., Exh.

16

3.) On the document assigning that management agreement to another Trivest entity, Earl Powell signed for both Trivest entities and Kaczynski signed for Plassein as vice president. (Wright Decl., Exh. 3.)

While the Court does not agree that this evidence proves that Plassein did not receive reasonably equivalent value in exchange for the Fees, the Court does find that the evidence presents a genuine issue for trial.

(2)   Insolvency

In order to succeed on his fraudulent transfer claim, the Trustee must also prove that, at the time of the transfer, Plassein either (i) was insolvent or became insolvent as a result of the transfer; (ii) was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they came due. *See* 6 Del. C. § 1304(a)(2) and 1305(a).

The Trustee's Complaint alleges that Plassein was insolvent at the time of the relevant transfers because its assets were "unreasonably small" in relation to its business. The Third Circuit has held that "unreasonably small capital" refers to the inability to generate sufficient profits to sustain operations." *Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1070 (3d Cir. 1992). The test for "unreasonably small capital" is "reasonable foreseeability." *Id.* at 1073.

In order to determine whether a firm has unreasonably small capital, courts must make an objective assessment of the companies' financial projections. The critical question is

17

whether the company's then-existing projections were reasonable and prudent when made. *Id.  See also Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007).  Courts often look at management's input into the creation of the projections to determine if a business plan was reasonable when made. *See In re Radiology Assoc., Inc.*, 611 A.2d 485, 490 (Del. Ch. 1991).  When there is substantial evidence presented to show that the business plan was prepared in a reasonable manner, using supportable assumptions and logically consistent computations, the plan constitutes a fair, reasonable projection of future operations and alternative projections of future operations should be rejected.  *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005).

Courts may also look to expert analyses by investment bankers and/or independent accounting firms that confirm the validity of management's projections to determine the reasonableness of the business plan.  *In re Iridium Oper. LLC*, 373 B.R. at 348.  Similarly, "[a] powerful indication of contemporary, informed opinion as to value" comes from private investors who "[w]ith their finances and time at stake, and with access to substantial professional expertise, [] concluded at the time [] that the business was indeed one that could be  profitably pursued."  *In re Longview Aluminum, L.L.C.*, 2005 WL 3021173, at *7 (N.D. Ill. July 14, 2005).  Finally, courts examining the question of adequate capital also place great weight on the ability of the debtor to obtain financing.  *See Moody*, 971 F.2d at 1071-73.

GulfStar claims that the Trustee has no evidence that Plassein's projections were not reasonable. Likewise, Trivest argues that the Trustee's reliance on his expert, David S. Scharfstein, Ph. D., prevents him from carrying his burden with regard to insolvency. Trivest contends that Professor Scharfstein "ignored all of the contemporaneous evidence discussing the reasonableness of Plassein's projections." (Trivest's Brief Supp. Mot. Summ. J. at p. 34.) The Court does not agree. The Trustee has propounded numerous material facts which, if established at trial, could lead the Court to rule in the Trustee's favor on the issue of insolvency.

According to Professor Scharfstein's expert report ("Scharfstein Expert Report")[11], Plassein's management predicted that the January Acquisition would enable Plassein to exceed historical industry growth and top growth projections for its industry. (Scharfstein Expert Report ¶¶ 17-18.) The projections assumed immediate volume discounts from Plassein's resin suppliers, despite no agreements being in place at the time of the January Acquisition. (*Id.* at ¶ 21.) With regard to the Rex Acquisition, management projected sales growth as high as 13.5 for the combined entities. (*Id.* at ¶ 33.) Professor Scharfstein has indicated that these projections were higher than Plassein's historical gross margins and considerably higher than those margins for the first five months of 2000. (*Id.* at ¶ 34.) Meanwhile, a confidential memorandum prepared by GulfStar in August of 1999 (the

---

[11] A copy of the Scharfstein Expert Report is attached as Exhibit 10 to the Declaration of Davis Lee Wright.

"Confidential Memorandum")[12] showed that Plassein paid a total of $2.020 million in interest

in 1998 and were projected to pay $2.159 million in interest in 1999.  (Conf. Mem., Exh. 3

at 2.)    According to the Confidential Memorandum, the debt burden was projected to

increase to $5.209 million in 2000, following the Acquisitions. (*Id.*)  Accordingly, Professor

Scharfstein concluded that "reasonable deviations from management's forecasts had

significant impact on [Plassein's] ability to avoid defaulting on its debt obligations."

(Scharfstein Expert Report ¶¶ 28, 40.)

There is also evidence that inside Plassein there was concern about Plassein's

financial condition, particularly cash flow and credit availability.  In May of 2000, on the

heels of the January Acquisition and before the Rex Acquisition, Frank McNabb, President

and CEO of Plassein, sent a letter to top-level managers detailing first quarter financial losses

and stating that "[t]he net effect of these results has impacted our available credit line since

every Company is drawing money out without anything being deposited." (Letter from Frank

McNabb dated May 9, 2000, attached to Bennet Decl. as Exh. 7).

An internal Fleet memorandum (the "Fleet Memorandum")[13] circulated in conjunction

with Plassein's request for further financing for the Rex Acquisition evidences that Fleet was

concerned about Plassein's performance.  The Fleet Memorandum provides:

---

[12]  A copy of the Confidential Memorandum is attached as Exhibit 2 to the Declaration of
G. Kent Kahle.

[13]  A copy of the Fleet Memorandum is attached as Exhibit 8 to the Declaration of Charles
R. Bennett.  Fleet led a syndicate of Plassein's lenders, as described above.

- ". . . Plassein has under-performed projections to date (including defaulting on financial covenants). . ." ( Fleet Mem. FL005526.)

- "'Soft' Plassein Results/Covenant Defaults. Plassein is currently in default due to violating leverage covenants as of 3/31/00 . . .The covenant violations were the result of two factors: (i) lower than projected interim 2000 financial performance (actual EBITDA is only 69% of the original plan through 5/00) and (ii) higher than expected senior debt resulting from unanticipated payments to bring vendors current at Transamerican and Nor Baker in the combined amount of $1.3MM." (*Id.* at FL005528.)

- "Plassein lowered its projected 2000 EBITDA by $1.8MM from the original planned $13.3MM to $11.5 MM." (*Id.*)

- "Overall, we are not relying on Plassein/Rex to fully achieve projected results." (*Id.* at FL005529.)

- "Excess availability [in line of credit] is currently $517M, down from the most recent three month average of $1,000M. This level of liquidity is viewed as inadequate for a company of this size, although excess availability is projected to increase to over $5MM when the Rex acquisition closes." (*Id.* at FL005533.)

  The Trustee insists that these facts prove that Plassein was left with unreasonably small capital following the Acquisitions.  The critical question is whether Plassein's financial projections were reasonable when Plassein pursued the Acquisitions.  *Moody*, 971 F.2d at

21

1073.  Based on the facts the Trustee submitted, the Court finds that a question exists as to whether Plassein's projections were in fact "prudent."  Moreover, determinations of solvency and insolvency are fact intensive by nature.  *Official Committee of Equity Security Holders v. Finova Capital Corp.*, 2006 WL 99817 (D. Del., April 13, 2006) at *2.  Accordingly, summary judgment is not appropriate.

## CONCLUSION

For the above-stated reasons, the Court will **DENY** (1) GulfStar's Motion for Summary Judgment and (2) Trivest's Motion for Summary Judgment.  An appropriate order accompanies the Memorandum Opinion.

Dated: May 5, 2008

KEVIN GROSS, U.S.B.J.

22